In the Matter of Proving the Alleged Last Will and Testament of TIMOTHY HURLEY, Deceased.

MARY MINIHAN and DENNIS HURLEY, Appellants; JOHN DUNSTON and DANIEL HURLEY, Proponents, Respondents.

First Department, December 5, 1919.

**Will — probate — testamentary capacity — evidence — verdict for contestants reinstated.**

On a proceeding for the probate of a will, evidence examined and *held* insufficient to establish that the testator was of sound and disposing mind and memory and possessed of testamentary capacity at the time of the execution of the instrument, and that an order of the surrogate setting aside a verdict of the jury in favor of the contestants and directing a new trial as contrary to the evidence was erroneous and should be set aside and the verdict reinstated.

APPEAL by Mary Minihan and another from an order of the Surrogate's Court of the county of New York, entered in the office of said Surrogate's Court on or about the 26th day of February, 1919, granting a motion made by the proponents to set aside as contrary to the evidence the verdict of a jury that deceased was not possessed of testamentary capacity when the alleged will was made, and granting a new trial.

*Albert Stickney* of counsel [*Charles A. Springstead* with him on the brief; *Joline, Larkin & Rathbone,* attorneys], for the appellants.

*William B. Ellison* of counsel [*Oliver B. Goldsmith* and *Benjamin F. Allen, Jr.,* with him on the brief; *Ellison, Goldsmith & Allen,* attorneys], for the respondents.

MERRELL, J.:

This appeal is by two contestants on the probate of the alleged last will and testament of Timothy Hurley, deceased.

The alleged testator was formerly an inhabitant of the State of New York, but died on December 31, 1917, at Stamford, Conn., while an inmate of Stamford Hall, a sanatorium for the treatment of the insane, and where he had been confined as an insane person since on or about December, 1905.

The paper propounded for probate is alleged to have been executed at the city of New York on February 24, 1905. The proceeding was instituted by the filing of a petition in the office of the surrogate of the county of New York on or about January 17, 1918, praying for the probate of said alleged will, and for the issuance of letters testamentary thereon to the proponents, one John Dunston, a former business associate of the decedent, and one Daniel Hurley, his nephew, both of the city of New York. The proponents were named as executors in said will. According to the petition, the heirs at law and next of kin of decedent were Dennis Hurley, a brother, residing at Hyde Park, Mass., Daniel Hurley, a brother, residing in Ireland, and Mary Minihan, a sister, residing at Brookline, Mass. The brother Dennis Hurley and the sister, Mary Minihan, filed objections to the probate of said instrument upon the ground that the paper offered for probate was not the last will and testament of Timothy Hurley, deceased; that it was not duly executed by decedent; and that he did not publish the same as his will in the presence of witnesses. The contestants further allege by way of answer to the petition for the probate of said instrument as the will of decedent, that at the time of its alleged execution on February 24, 1905, Timothy Hurley was not and for a long time prior thereto had not been, of sound mind, memory

First Department, December, 1919.          [Vol. 189.

or understanding, or mentally capable or competent of executing a last will and testament, but that he was at such time of unsound mind and mentally incompetent; that the paper offered for probate was not freely or voluntarily made or executed by said decedent as his last will and testament, but that the execution thereof was obtained by undue influence and fraud, and was illegal and void and not entitled to probate. The contestants duly demanded a trial by jury of the issues raised by their answer, and such trial was ordered by one of the surrogates of New York county. The order directed the trial by jury of the following issues of fact:

1. Did Timothy Hurley, the testator, subscribe the paper offered for probate at the end thereof in the presence of the attesting witnesses or any two of them, or acknowledge to them or any two of them that such subscription appearing on said paper had been made by him?

2. At the time of making such subscription or acknowledgment, did the said Timothy Hurley declare to the attesting witnesses or to any two of them that the paper offered for probate was his last will and testament?

3. Were there at least two attesting witnesses each of whom signed his or her name at the end of said paper at the request of the said Timothy Hurley?

4. At the time of the execution of the paper offered for probate was said Timothy Hurley of sound and disposing mind and memory and possessed of testamentary capacity?

5. At the time of the execution of said paper was said Timothy Hurley free from restraint?

6. Was the execution of said paper by said Timothy Hurley caused or procured by the fraud of any person or persons?

7. Was the execution of said paper by said Timothy Hurley caused or procured by undue influence of any person or persons?

The trial was commenced before the surrogate and a jury on December 16, 1918. A jury was impaneled and a large amount of testimony was presented, both by the proponents and the contestants, concerning the various issues presented. At the close of the evidence the learned surrogate eliminated from the consideration of the jury all of the issues directed to be tried by the order theretofore made by him, with the

exception of the fourth, the surrogate holding that upon the testimony there was no sufficient evidence from which the jury could properly return a verdict in accord with the contention of the contestants upon the issues thus eliminated, and finally submitted to the jury for its determination upon the testimony offered the fourth question only, whether: " At the time of the execution of the paper offered for probate was said Timothy Hurley of sound and disposing mind and memory and possessed of testamentary capacity? "

The question thus submitted was answered by the jury in the negative. Thereupon a motion was made by counsel for the proponents to set aside the verdict thus rendered, as against the weight of the evidence. The decision of such motion was deferred, the learned surrogate receiving briefs of counsel for the respective parties thereon. After deliberation, the surrogate made a decision accompanied by a brief opinion granting the motion to set aside the verdict and for a new trial upon the ground of preponderance of evidence in favor of the testator's competency to make a will at the time of the execution of the paper offered for probate. Thereupon the order appealed from was entered wherein it was ordered, adjudged and directed that the motion to set aside the verdict of the jury and for a new trial be and was thereby granted on the ground that the said verdict was against the evidence. From such order the contestants have brought this appeal.

The question presented for our determination is as to whether or not the surrogate properly set aside the verdict of the jury upon the sole issue of the competency of the decedent to execute the alleged last will and testament.

A large amount of testimony was presented upon the trial and from a careful consideration thereof I am convinced that the learned surrogate was in error in his impression that there was an " overwhelming preponderance " of evidence presented upon the trial in favor of decedent's competency to make a will at the time he is alleged to have executed the paper offered for probate. Contrary to such apparent impression of the surrogate upon which he acted in setting aside the verdict of the jury, I find that the evidence is most convincing, and admits of little question, that at the time it is claimed the decedent executed the paper in question he was

First Department, December, 1919.     [Vol. 189.

incompetent, irrational and incapable of making a valid testamentary disposition of his property.

The life history of the decedent and the circumstances surrounding the alleged execution of the paper propounded for probate are interesting. Hurley was born in Ireland, immigrating to this country about the year 1896. He came to New York in 1897 and obtained employment as a waiter in Burns' restaurant on Sixth avenue. One John Dunston was also a waiter there at that time and a friendship seems to have sprung up between these men. Not long after becoming acquainted, both Hurley and Dunston left the restaurant in which they were employed as waiters, and embarked in the restaurant business for themselves upon Sixth avenue at the restaurant afterwards known as " Jack's." For a time Hurley and Dunston were copartners, Hurley, however, owning but a one-sixth interest in the business, the remaining five-sixths interest being held by his copartner, Dunston. On January 9, 1905, the business was incorporated, the stock being divided between Dunston and Hurley in the same proportions, one-sixth to Hurley and five-sixths to Dunston. The corporate name of the new enterprise was " Jack's," and the business continued successfully thereafter until the death of Hurley, which occurred, as before stated, in December, 1917. In the conduct of this business enterprise, Dunston, or " Jack," as he was popularly known, had charge of the management of the restaurant proper, while Hurley's activities were confined to the kitchen and cellar. Hurley was married but childless, and resided with his wife in the third story of the building in which the restaurant was situated. Hurley's wife died in the month of August, 1904. Up to about that time the various witnesses all describe Hurley as a quiet, hardworking, sober man, inclined to be saving and prudent in money matters, indeed, as one witness described him, " avaricious." He did not indulge in intoxicants, nor was he given to dissipation or disorderly habits. He apparently entertained for his wife a deep regard and affection and his domestic life appears to have been all that could have been desired. The witnesses offered by the contestants, however, testify that just prior to the death of his wife a strange change appeared to occur in the conduct and

habits of the decedent. He seemed to be dazed at times and not to appreciate his surroundings. He failed to apparently appreciate the loss of his wife or to understand its significance. After his wife's death he indulged heavily in intoxicating liquors, he became profligate in the use of his money, spending large sums upon undesirable people, visited houses of ill repute, associating with gamblers, prize fighters and harlots, going on protracted debauches, became inattentive to his business, and in almost every respect adopted a mode of living quite at variance with that which had characterized his earlier life. He became incoherent at times, entertained strange delusions and hallucinations, and was finally, in December, 1905, committed to Bellevue Hospital for observation, and thereafter placed in the Connecticut sanatorium, where he remained an inmate until his death. During the several years after his confinement, according to the testimony of the physicians and others who saw him from time to time, his mental condition grew steadily worse, and he died in December, 1917, without having regained his reason.

The proponents, in support of the instrument which was offered for probate, called, first, two of the three subscribing witnesses, the third having died since the alleged execution of the will. The first witness, John George, testified that he was a waiter at the restaurant known as " Jack's," and that he had worked in the restaurant as a waiter since 1900, and for a period of about five years prior to the signing of the alleged will. This witness testified that on the day of the alleged execution of the will he was asked by Hurley to witness its execution, the transaction occurring in the middle room of the restaurant on Sixth avenue. The witness George was a Greek, having been born at Cypress Island. For a time he had resided in the family of Mr. and Mrs. Hurley. He testified that at the time of the alleged execution of the will Hurley was in good condition mentally.

Champe F. Andrews, formerly an attorney practicing law in the city of New York, but now a resident of Chattanooga, Tenn., and who at the time of the alleged execution of the paper in question was counsel for Dunston and had for several years rendered legal services for him, and who prepared the paper offered for probate, and who was a subscribing witness,

First Department, December, 1919.          [Vol. 189.

testified as to the execution of the will. Andrews testified that he had prepared the incorporation papers for " Jack's " restaurant shortly prior to being called upon to prepare the will in question; that he had little acquaintance with Hurley, except as he had seen him with reference to the accomplishment of such incorporation, and in the preparation of a contract executed between Hurley and Dunston with reference to their respective stock in the corporation and its disposition in case of the death of either. Andrews testified that he was waited upon a few days prior to the alleged execution of this will by Hurley, who requested its preparation, and that he received from decedent full directions with reference to the disposition to be made of his property. Andrews testified that Hurley also conveyed to him the particulars with reference to two illegitimate children mentioned as residuary legatees in said alleged will, of whom he claimed to be the father, and directed that upon inquiry he, Andrews, divulge to said children the particulars with reference to their parentage. Andrews testified that at the time of the execution of the alleged will Hurley was of sound mind and competent to rationally and sensibly execute a will disposing of his property. According to his testimony, Andrews for a number of years had been an important figure in connection with the business affairs of Dunston and in reference to the legal side of the management of the business known as " Jack's Restaurant." He also testified that shortly prior to the preparation of the alleged will he had drawn a similar instrument for Dunston. Upon being requested for his notes and memoranda which he claims to have taken concerning the disposition of decedent's property and of the matters discussed by them in their interview preliminary to the preparation of the will, Andrews disclaimed possession thereof, saying that he had destroyed such memoranda.

Upon the testimony of said two subscribing witnesses the proponents rested.

The two contestants were sworn as witnesses, but under objection of counsel for the proponents they were not permitted to testify as to any personal transactions with the deceased. It did, however, appear from the testimony of the contestant Dennis Hurley that another brother of the

witness and of the decedent, one Patrick Hurley, had been an inmate of an asylum for the insane at Cork, Ireland.

John A. Minihan was called as a witness in behalf of the contestants. He was a son of Mary Minihan, one of the said contestants, and of the age of forty-four years at the time of the trial. This witness testified that he was well acquainted with the decedent during his lifetime and had seen him at the home of the witness in Brookline, Mass., and in the city of New York; that the witness last saw decedent in New York in the year 1900, and that the decedent then spoke to him regarding the kindness of the mother of the witness, the contestant Mary Minihan, toward the decedent during his earlier years, when she had brought him and the other brothers from Ireland to her home, keeping them there until they had started out in life and obtained employment, and that she had been a mother to him when he was a young child. This witness testified that decedent was anxious to adopt the eldest daughter of his said sister, and that he was godfather to his sister's youngest boy, who was named Timothy for him; that he had often remembered his said niece with presents.

The contestants next produced as a witness Daniel Sullivan, who for twenty-three years had been an examiner in the law department of the city of New York. Sullivan testified that he knew decedent in his lifetime, and that he frequently saw him in 1904 and 1905. It will be recalled that the will in question is claimed to have been executed on February 24, 1905. The witness testified that his duties took him frequently in the vicinity of " Jack's " restaurant as a claim investigator; that he recalled the occasion of the death of decedent's wife, which occurred in August, 1904, about six months prior to the execution of the alleged will, and that prior to his wife's death Hurley had been a man of quiet, honest habits, sober and not given to drinking intoxicating liquors; that he was thrifty and careful with his money, and was a hardworking man prior to his wife's death. The witness testified that he was present at the wake which was held upon the remains of the wife of decedent after her death, and that on this occasion at about two o'clock in the morning, Hurley came into the room where the body had been placed

First Department, December, 1919.　　　　[Vol. 189.

and where it was surrounded by friends, some of them sitting down and some of them standing, and that at that time he was dressed only in his underclothes, and that he wanted to know what the people were all there for; that he did not seem to realize what the situation was at all; that he was then led from the room by someone present; that he was not intoxicated at the time, but appeared to be unconscious of his surroundings. The witness testified that these acts impressed him at the time as being irrational. The witness further testified that in February, 1905, which was the month when it is claimed that the will proposed for probate was executed, he had a conversation with Hurley in which the latter stated that he had run away from home and enlisted in the British army and had been sent to South Africa where he was promoted to the rank of lieutenant; also, that when his regiment went back to England, that he, through his own standing and through his superior officers, obtained an audience with and was introduced to the Prince of Wales, later King Edward; that he said to prove his statements he had his uniform in the house in a trunk, and that he would show it to Sullivan and how he looked in it. Witness testified that these statements were in substance repeated to him half a dozen times in the latter part of 1904 and the early part of 1905, decedent claiming that he was a fine looking man and well shaped when he wore his uniform. He said, according to the testimony of the witness, that he was at Windsor Castle and was introduced to King Edward. The witness Sullivan further testified that after the death of his wife he observed a change in the habits of the decedent; that he seemed gradually to get worse in his mental condition; that in carrying on conversation he would talk about subjects earnestly, and drop off and speak about something foreign to the matter he was discussing, and then get confused and lost altogether as to both subjects; that his memory was defective, and that he used intoxicating liquors; that he abandoned his habits of frugality and became a liberal spender of his money; that on one occasion before his wife's death the decedent told the witness, Sullivan, that he had trouble with his head and could not sleep; that he had to go to a doctor for treatment, and that the doctor prescribed for him and told him that

after finishing his work in the morning he should take long walks and visit sporting houses and stay until eleven o'clock in the day and he thought he would sleep; that he did not seem to realize his situation at that time, although friendly to all appearances with his wife.  At the suggestion of the witness that he employ a nurse to attend his wife during her last illness, the decedent declined upon the ground that the nurse caused his wife to take fright; that he seemed dazed and did not realize the condition of his wife or her situation. The witness further testified that he saw decedent in December, 1905, after he had been placed in the Bellevue Hospital for observation, and that his condition was then worse than when he had seen him earlier in the year; that the witness went to Stamford to see him twice, and found him irrational; that he knew Andrews by sight as a hanger-on around " Jack's " restaurant.

Dennis Sullivan, a patrolman, testified that from 1900 to December, 1904, he lived in the apartment of the decedent; that at that time he was a bartender at Jack's restaurant; that prior to the death of Hurley's wife his habits were good; that he was always working and attentive to his business, and upon the premises, except when out for short walks; that he was very close in money matters, " very tight and close and saving; " that following his wife's death and within two or three weeks thereafter Hurley was an entirely different man, drinking heavily of Scotch whisky in large portions, and spent his money lavishly, the witness testifying that on one occasion he saw decedent take a roll of money, which he said contained $700, from a place where he kept it in the wine cellar of the restaurant, and leave the premises, returning a half hour later with a statement that he had been " cleaned out; " that he then went to a little wooden box where he kept his money, taking therefrom more money and leaving the premises; that he did not see him again that day; that he became inattentive to his work and incoherent in his talk; that he imagined that he was an English ex-army officer, and stated that he had an English army uniform in his trunk upstairs, but never exhibited the same to the witness; that the witness continued to live with Hurley for three months

First Department, December, 1919. [Vol. 189.

after his wife's death, at which time the decedent brought a woman to the apartment, whom he introduced as his mistress, and at this time the witness left.

Patrick J. Frawley, a witness called by contestants, testified that he was by occupation the proprietor of a taxicab and auto business, and that he had known decedent for thirty years prior to his death; that in 1904 and 1905 the witness had a place of business at 801 Sixth avenue and another stable at Forty-sixth street, and that he had a cab stand one block north of Jack's restaurant; that in the winter of 1904 he had an apartment over Jack's restaurant during the winter months and saw decedent frequently; that he observed the relations between Mr. and Mrs. Hurley, and that they were always very fine; that Hurley himself was an industrious man who never drank or dissipated, was careful of his money and more or less avaricious; that after the death of his wife Hurley changed entirely; that he spent money foolishly and became extrava-gant, and that within two months after his wife's death dissipation showed upon him; that prior to this change decedent was careful of money matters, did not buy jewelry or bestow expensive presents, and that the witness had never seen Hurley in an intoxicated condition. The witness Frawley described one incident occurring about the first of the year, and only a little over a month prior to the alleged execution of the paper propounded for probate. Frawley testified that in January or around the holidays following the death of his wife, Hurley came to his stable one day, accompanied by a young man, and said, " Pat, I want you to meet my son," and that he replied, " All right, Tim," and that Hurley said, " This is my boy; " that decedent said he was twenty-four years of age, and that the witness told him that the boy did not look to be twenty. Hurley insisted that he was twenty-four years of age, and was his son, and said that he was going to take him around to his barber shop on Broadway. Upon inquiry being made by the witness as to whether he had a barber shop, Hurley answered in the affirmative. The witness accompanying Hurley and the young man walked around to Broadway and went to a barber shop having Hurley's name over it. All three went in, and he there inquired of the boy how long Hurley had been acting in that manner, and the boy

replied that Hurley was not his father; that Hurley had picked him up on Sixth avenue, and had given him five dollars to go down to the witness' stable. Afterwards the witness asked Hurley what he meant by " kidding " him about that boy as his son, and Hurley replied, " I guess I must have been." The witness further testified that a few weeks later he again met decedent and the latter told him that he had an appointment with Vanderbilt to buy the Sixth avenue elevated and all the other elevated lines, and that the witness replied that to do so would require millions; that Hurley answered that he had millions; he said he had an appointment with Vanderbilt the next day and said he was going to buy the " L " road and said, " It will be only a matter of time when Gould and Vanderbilt and Morgan will be working for me." At the solicitation of the witness he went to the Murray Hill baths, where the witness left him. Relative to the barber shop, Frawley testified that the place was a small shop, and that Hurley told him that he had bought it and was going to buy other barber shops, and that it was a profitable business to be in. Witness testified that on another occasion Hurley told him that he had a commission in the English army from King Edward, and that his people in Ireland had a big estate and the government confiscated it and he had taken it to the Court of Chancery and got it back, and that through getting his estate back the King gave him the commission. The witness testified that on the occasions of · these talks Hurley appeared to be irrational. Frawley also testified that they were all poor when they lived in Ireland. . On another occasion he testified that Hurley had stated to him that he had a uniform of the English army at the house which he was going to wear on St. Patrick's Day, and that he was a descendant of one or two Irish kings, and that was why he had recovered his large estate in Chancery; that the condition of Hurley continued to grow worse as time passed.

Edward Greenthal, an attorney and counselor-at-law of twenty-eight years' practice, testified that he knew Timothy Hurley during his lifetime, having met him first in the summer of 1903, and that he last saw him about December 30, 1905, when he was in the sanatorium at Stamford, Conn.; that in the winter of 1903 the witness saw him two or three times a

First Department, December, 1919.          [Vol. 189.

week; that he knew Hurley's wife and prior to her death had seen Hurley frequently; that Hurley was a careful man about money and not a spendthrift prior to his wife's death, and a hard worker; that after her death he drank some; that he complained to the witness about women stealing his jewelry, and stated to the witness that he had given away quite a lot of money; that he claimed to have a half interest in Jack's restaurant, and to be worth from $300,000 to $400,000; that his habits became dissolute and on one occasion he caused the arrest of a lewd woman to whom he had given a sealskin coat, claiming that she had stolen the same from him.  This witness testified that in December, 1904, Hurley came to him and said he was getting shaved in a barber shop on Broadway between Forty-fifth and Forty-sixth streets right above a livery stable, and that he wanted to get rid of a barber who was working there; that afterwards he applied to the proprietor for the discharge of his employee, and being unsuccessful, about the first of January bought the barber shop and thereafter a sign bearing the name of Hurley appeared over the door; that Hurley insinuated that the lawyer Andrews, who was attorney for Dunston, was trying to cheat him, and that Andrews was trying to railroad him and have him sent to a lunatic asylum; that on one occasion Hurley said that he had a fur-lined overcoat which was the identical coat in which he brought his child over from Ireland; that he brought it over in the pocket of the coat; that Hurley came to the witness in an intoxicated condition two or three times and came early in the morning and sometimes in the afternoon, making complaint of different women robbing him of his jewelry and that certain prize fighters had taken jewelry from him; that his memory was poor on those occasions, and that he would talk for about five or ten minutes and then ask the witness what he had been talking about.  Witness testified that these acts and conversations impressed him at the time as being irrational. The same witness also produced a letter written in the Stamford sanatorium on December twenty-third, after his confinement there, and addressed evidently to Dunston, as follows:

" DEAR FRIEND JACK.— Give bearer $200 to my counsel Mr. Greenthal and you will oblige Timothy Hurley.  How are you Jack?  What did I do to you that you did not go to

see me in Bellevue? I would not do that to you in a hundred years some one have you steered from me I don't blame you at all for you were the only one I missed to hell with the others I did not want to see them but you Jack.

" Mike and Andrews are better leve the city for I will put their heads in the halter for falce prison five hundred thousan."

This note had been handed to the witness by Hurley in the sanatorium to be delivered to Jack. At the top was written: " I will kill Jerome and Hammond." Hammond was Dr. Graeme Hammond, one of the certifying physicians at the time of his commitment to Bellevue.

Michael Hurley, a nephew of decedent, was sworn by the contestants, and testified that by occupation he was a waiter, and that in 1904 and 1905 he was a bartender at Jack's restaurant, 761 Sixth avenue; that during those years he saw much of Hurley and observed him particularly in 1904 and 1905. The witness described Hurley's irrational conduct resulting in his commitment.

Dr. Menas S. Gregory was sworn, and testified that he was formerly a physician connected with Bellevue Hospital, and that his particular work was as director of the psychopathic department at the hospital; that his department dealt with mental cases and cases of insanity committed there for examination and observation; that the annual admissions to the hospital were about 5,000. The witness described the condition of Hurley as disclosed by the records of the institution and testified that in his opinion he at that time was suffering from paresis resulting from syphilis. The witness described the condition of paresis and its effect upon human beings, stating that the first symptom was loss of memory; that the judgment of the individual changed; that he would do things that he never did before, and that his character would undergo a change; that if he were a sober man he might begin to drink, and if penurious he would become extravagant; that if he were a modest man he would become immodest; that if he were a moral man he would do immoral things; that at first the change might not be very noticeable to the layman, but in time, after the disease was seated, the change became evident; that the foundation of the trouble was syphilitic

First Department, December, 1919.          [Vol. 189.

disorders, and that the witness had seen cases where the syphilis had existed twenty-five years before the onset of paresis, but the average was three to five years; that some shock, either mental or physical, or some emotion, would hasten the onset of the disease; that the will of the patient became affected; while at times he might be obstinate, at other times he would become pliable; that one suffering from paresis was very impressionable; he might be happy for a moment, and then very sad and tearful. The witness detailed from the hospital records concerning the case of Hurley that he had a tremor of the tongue and fingers, the fingers being outstretched; that the tremor of the fingers was characteristic of the disease; that there was a slurring of the speech, a failure of coordination of the tongue and the muscles of the mouth and lips; that the pupils of the eyes were unequal; that the knee jerks or the reaction that comes from tapping the tendon below the knee-cap were exaggerated; that this exaggeration was character-istically present in Hurley's case; that the record disclosed a his-tory of syphilis extending back about eleven years, that is that for eleven years prior to the examination of Hurley he had suf-fered from syphilis, and that for two years he had been treated for that disease. Dr. Gregory was then asked upon an hypothesis covering the condition of Hurley as shown by the evidence whether or not he was able to form an opinion as to whether Hurley was suffering from paresis in August, 1904, to which the witness testified that he was, and also as to February, 1905, and that in the opinion of the witness during that period and at those times he was of unsound mind and suffering from the disease which finally brought him to Bellevue Hospital, and upon the assumption of the facts embraced in the hypothesis propounded to the witness, Dr. Gregory testified that in February, 1905, Hurley was not, in his opinion, in the possession of sufficient memory to collect in his mind without prompting the particulars and elements of the business to be transacted relative to the execution of his will; that he could not at that time in the opinion of the witness hold said matters in his mind a sufficient length of time to perceive at least their obvious relation to each other or to form a rational judgment in relation thereto. The examination of Hurley conducted by Dr. Gregory was made in conjunction

with Dr. Graeme Hammond, and Dr. Gregory testified that at that time Dr. Hammond and he had agreed as to the condition and disease from which Hurley was suffering.

Dr. Frank Wade Robertson, a physician, residing at 412 West End avenue, was called as witness by the contestants. Dr. Robertson testified that he had made a specialty of treating mental and nervous disorders; that he graduated from Columbia in 1895, and that he had preceded Dr. Gregory in charge of the pavilion for the insane at Bellevue Hospital for several years; that from Bellevue he went to Elmira and was chief physician and superintendent of the reformatory there for a number of years; that at the present time he is attached to Roosevelt Hospital in charge of mental and nervous disorders there, and that at the time of the trial was consulting physician at Manhattan State Hospital at Ward's island. His qualification to testify was conceded by counsel for the proponents. Asked in regard to his ability to form an opinion as to the condition of mind of Hurley in August, 1904, and in February, 1905, based upon the hypothesis contained in the inquiry propounded to Dr. Gregory, Dr. Robertson stated that he was able to form such opinion, and that in his opinion in August, 1904, and in February, 1905, Hurley was of unsound mind and was suffering from paresis, was irrational and unsound, and that he was of the opinion that he was not able at either of those times to collect in his mind without prompting the particulars or elements of business to be transacted or to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other or to form a rational judgment in relation to them; that in his opinion Hurley was not of sufficient mentality to intelligently execute or understand the agreements executed by him with Dunston relative to the affairs at Jack's restaurant prior to the execution of the alleged will. Dr. Robertson testified that he was personally acquainted with Hurley in his lifetime, and that he saw him first some time in February, 1905 or 1906. The doctor testified that at this time Hurley was insane. The witness testified to a conversation with Hurley at the Connecticut sanatorium in February, 1906, showing that at that time Hurley was possessed of strange delusions.

The foregoing constituted substantially the testimony

offered by the contestants upon the question of the mentality and testamentary capacity of the alleged testator.

To meet this the proponents produced Dr. Graeme Hammond, who testified that he had examined Hurley at the time of his commitment to Bellevue, and had then thought and certified that he was suffering from paresis, but that he had learned since that he was mistaken; that his information causing him to discredit his earlier conviction with reference to the disease with which Hurley was suffering came directly from Dr. Givens, the superintendent of the Stamford sanatorium, the witness testifying that Dr. Givens had told him certain things which led him to believe that he had been mistaken in his earlier diagnosis, and that he could not dismiss from his mind the things that Dr. Givens had told him. The witness admitted that at the time of the commitment of Hurley to Bellevue he had agreed with Dr. Gregory that he was suffering from paresis, but testified that he was equally positive at the time of the trial that he was then mistaken. In the opinion of Dr. Hammond, Hurley, at the time of such commitment, was suffering from syphilis, but he testified that he did not believe that paresis resulted from such syphilitic disorder.

One other witness was called by the proponents, George Gates, who was also a waiter at Jack's restaurant, and who testified that up to within six weeks of his being placed in the sanatorium Hurley was rational and all right.

The foregoing is substantially all of the evidence given by both sides upon the question of the mental capacity of Hurley.

How the learned surrogate could have said, in view of the testimony produced upon the trial, that there was an overwhelming preponderance of the evidence in favor of the proponents and showing mental capacity on Hurley's part, is beyond understanding. Evidently the learned surrogate did not have the record before him, nor did he consider in detail the evidence which had been given. Had he done so he could not have arrived at the conclusion which he did in reference to the weight of evidence. Upon the ground that the verdict was contrary to the weight of the evidence there was no warrant in setting aside the verdict of the jury. Indeed, had the jury found that decedent was competent and of sufficient

mental capacity to execute a will at the time it is claimed he executed the paper proposed, the verdict of the jury must surely have been set aside as against the weight of the evidence.

Upon this appeal both parties concede the action of the learned surrogate in setting aside the verdict to be within his power, subject only to review in this court. I think the verdict of the jury was adequately supported by the evidence and in full accord therewith.

I am, therefore, of the opinion that the order setting aside the verdict of the jury and directing a new trial should be reversed, and the verdict of the jury reinstated, and that thereon a decree should enter in Surrogate's Court dismissing the petition herein and denying probate of said alleged last will and testament.

CLARKE, P. J., LAUGHLIN, DOWLING and PAGE, JJ., concurred.

Order reversed and the verdict of the jury reinstated and the proceeding remitted to the surrogate for further action in accordance with the opinion of this court.